## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No.** 22-mj-8179-RMM

**UNITED STATES OF AMERICA**

**v.**

**ANTON PECK,**

FILED BY_____*SP*_____D.C.

*May 6, 2022*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

_____ /
       **Defendant.**

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?     ___ Yes   ✓ No

2.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?     ___ Yes   ✓ No

3.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?     ___ Yes   ✓ No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY: _____

DANIEL E. FUNK
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.   0592501
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:     305-905-7509
Fax:     561-820-8777
Email:   daniel.funk@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No.  22-mj-8179-RMM |
| ANTON PECK, | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

FILED BY _____ SP _____ D.C.

**May 6, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 16, 2021 until April 13, 2022___ in the county of _____Palm Beach_____ in the
___Southern___ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§  841(a)(1), 846, and 841(b)(1)(A)(viii) | Conspiracy to distribute 50 grams or more of methamphetamine |
| 21 U.S.C. §§ 841(a)(1), 846, and 841(b)(1)(B)(vi) | Conspiracy to distribute 40 grams or more of fentanyl |
| 21 U.S.C. §§ 841 and 841(b)(1)(A)(viii) | Possession with intent to distribute 50 grams or more of methamphetamine |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Arturo Calderon
*Printed name and title*

Sworn to me via Telephone-FaceTime
by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1.

Date:  5/6/22

_____
*Judge's signature*

City and state:          West Palm Beach, FL                    Ryon M. McCabe, U.S. Magistrate Judge
                                                                *Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR CRIMINAL COMPLAINT**

I, Arturo Calderon, being first duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and I have been so employed since April 2008. I am currently assigned to the Safe Streets Task Force Squad of the West Palm Beach Resident Agency. I have been primarily assigned to the investigation of gangs, drug trafficking, violent crimes, organized criminal enterprises, and bank robberies. I have been instructed in investigative techniques concerning drug trafficking offenses including dark web narcotics violations. Prior to joining the FBI, I was employed as a Federal Air Marshal and as a U.S. Immigration Inspector with the U.S. Immigration and Naturalization Service before joining the Federal Air Marshals. I have investigated and obtained convictions against multiple drug traffickers engaged in the interstate smuggling and sale of narcotics using the dark web, postal system, and other means of distribution, supply, and transport. I have attended conferences to receive training specific to dark web narcotics trafficking and the use of internet platforms to commit other illicit activities. My training and experience include investigating the use of The Onion Router, Virtual Private Network services, and encrypted software services used by drug traffickers to conceal their activity from law enforcement. Accordingly, I have worked on numerous cases involving violations of 21 U.S.C. §§ 841(a)(1), 846 and 843(b).

2.      This affidavit is made in support of a criminal complaint charging Anton PECK, a/k/a "Alexei IVANOV," a/k/a "Alex IVANOV," a/k/a "Syntropy," with conspiracy to distribute 50 grams of more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 841(b)(1)(A)(viii); conspiracy to distribute 40 grams of more of fentanyl, in violation of 21 U.S.C.

1

§§ 841(a)(1), 846 and 841(b)(1)(B)(vi); and possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), and 841(b)(1)(A)(viii).

3.    Since this affidavit is being submitted for the limited purpose of securing a complaint, I have not included every fact known to me concerning this investigation. I have included only those facts and circumstances I believe are sufficient to establish probable cause for the issuance of the requested complaint.

4.    The statements contained in this affidavit are based upon my investigation, information provided by other sworn law enforcement officers, and my experience and training as a federal agent.

## PROBABLE CAUSE

5.    This application stems from an ongoing criminal investigation into illegal narcotics dealers operating on criminal online marketplace websites, including Dark0de Marketplace, White House Marketplace, World Marketplace, and other marketplaces used for the illicit sale/purchase of controlled substances. During this investigation, I have learned that there are many criminal marketplaces accessible through The Onion Router ("Tor") network on the "Dark Web." Dark0de Marketplace, White House Marketplace, World Marketplace, and other marketplaces used for the illicit sale/purchase of controlled substances are designed to promote the anonymous sale of illegal items, such as narcotics, in exchange for Bitcoin and other peer-to-peer cryptocurrencies (also known as "virtual currencies"). These Dark Web drug marketplaces are made up of vendor profiles akin to those profiles or "shops" seen on websites such as Ebay.com. Each vendor profile can offer a selection of products to sell. These products are generally different quantities of narcotics offered for sale. This complaint concerns the operation of narcotics vendor profile "Syntropy" by Anton

PECK on Dark0de Marketplace, White House Marketplace, World Marketplace, and other marketplaces used for the illicit sale/purchase of controlled substances.

**Background on the Tor Network and the Dark Web**

6.      The Internet is a global network of computers and other devices.  Devices directly connected to the Internet are identified by their unique IP address.  An IP address is used to route information between devices.  Generally, when one device contacts a second device, the first device must be directed to the IP address of the second device.  Moreover, when the first device contacts the second device, the first device provides its own IP address to the second device, so that the second device knows where to direct its response.  Accordingly, the two connected devices (for instance, a home computer and the www.google.com website server) know each other's IP address.

7.      The typical user may not know the IP address of a website visited.  Typically, a user will type the domain name of the website which commonly corresponds to a plain-language name for the website, *e.g.,* www.google.com into the Uniform Resource Locator ("URL") bar at the top of their web browser. This domain name will be transmitted to a Domain Name System ("DNS") server, which then translates the domain name into the appropriate numerical IP address, and thereby allows the user to connect with the requested website.  Conversely, if a user knows of a unique IP address for a particular website, generally[1] the user can type that IP address directly into the URL bar and access the website in that manner.

8.      In addition, publicly available databases can be easily searched to obtain the IP address for any known URL and the registered owner and location of any IP address. Thus, with

---

[1] The server or virtual server with a particular IP address can host multiple websites, in which case entering that particular IP address would not direct a user to a single website. However, if an IP address is associated with a single website, entering the IP address as described above would direct the user to that particular website.

additional inquiry, most any URL or IP address can be traced to its owner and physical location.[2] This is problematic for anyone conducting criminal activity on the internet and wishing to remain anonymous.

### User Anonymity Provided by the Tor Network

9.     The Onion Router (Tor) network is a special network of computers, distributed around the world, designed to conceal the true IP addresses of the users of the network.  Every communication sent through Tor is directed through numerous relays within the network—and wrapped in a layer of encryption at each relay—such that the end recipient of the communication has no way of tracing the communication back to its true originating IP address.

10.     In order to access the Tor network, anyone can simply download the Tor browser software and use it to access the internet. The user simply inputs a website IP address or URL into the Tor browser and the Tor browser automatically encrypts and routes the communication through several relays and then out to the destination so that the destination website can only see the IP address of the last (or "exit") relay and not the IP address of the device actually connecting to the destination website.

11.     By way of illustration, in a standard internet communication, when a person connects to a website, that website can see that person's IP address:



---

[2] Private individuals operating home computers usually do not own and register their own IP address; instead, they subscribe to broadband accounts with ISPs, such as Comcast or AT&T, which in turn assign or lease an IP address to them (the subscriber). Nevertheless, the IP address can usually be traced to its assigned user at a given point in time using the ISPs' records of which subscriber was assigned which IP address and when.

In this illustration of a standard internet connection, the website www.google.com can see the home computer IP address (123.456.789) and, of course, the user of the home computer knew the URL, and therefore the IP address, of www.google.com, which the user had to type into his browser to connect to the website in the first place.  Thus, each user's IP address is known to the other, and the owner and location of both can later be traced.  Similarly, any person monitoring the internet traffic at a point between the two IP addresses, would see the connection between IP address 123.456.786 and www.google.com, and know that those two devices were communicating.

12.     On the other hand, in the case of a Tor network communication, when a person connects to a website, the traffic is encrypted and routed through multiple relays, and that website cannot see that person's IP address:



In this illustration of a Tor network connection, the website www.google.com *cannot* see the home computer IP address (123.456.789); instead, it only sees the IP address of the device it is directly connected to, in this case, the third (or "exit") Tor relay, with IP address 003.003.003, which cannot be traced back to the home computer user.  In addition, any person monitoring the internet traffic at a point between the home computer and www.google.com would *not* know that those two devices were communicating.  Instead, depending on the monitoring point, that person would only see the direct connections between the home computer and first (or "entry") Tor relay, between

the first and second, or second and third Tor relays, or between the third (or "exit") Tor relay and www.google.com.

13.     As with a standard internet connection, the user must have known the URL or IP address of the website in order to have directed a connection to it through the Tor network. Accordingly, although the IP address of the user is hidden from the website, the IP address of the website must be known to the user—the anonymity is only one-way.  The Tor network addresses this one-way anonymity through a feature known as "hidden services."

**Hidden Services: Website Anonymity Provided by the Tor Network**

14.     To achieve true, two-way anonymity, the Tor network also enables websites to operate inside the network in a manner that conceals the true IP address of the computer server hosting the website.  Such "hidden services" operating on Tor have complex web addresses, generated in a computer algorithm, ending in ".onion."  Unlike a standard URL, there is no way to retrieve a website server's true IP address from its .onion Tor address alone.  This alleviates the need for a Tor network user to know the true IP address of a website.  Rather the user can direct his/her Tor browser to the .onion address, reach the website, and neither the user nor the website knows the other's IP address—two-way anonymity is achieved.  This network of anonymous users and websites is the Dark Web.

15.     Criminals have taken advantage of the Dark Web to create websites with online marketplaces dedicated to the trafficking of controlled substances and other illicit goods. Websites such as www.deepdotweb.com maintain an overview of illegal marketplaces operating on the Dark Web, and how-to guides such as: "How to Buy Drugs Online from Darknet Markets."[3]

---

[3] https://www.deepdotweb.com/2015/12/30/buy-drugs-online-from-darknetmarkets/

**Description of Involved Marketplaces**

16.     Dark0de Marketplace, White House Marketplace, World Marketplace, and other marketplaces used for the illicit sale/purchase of controlled substances function as intermediaries between buyers and sellers. Sellers create accounts in these marketplaces to advertise their products, such as narcotics or hacked computer passwords, and buyers create accounts to browse sellers' products and purchase them; in this regard, the marketplace website interfaces are similar to well-known, legitimate online marketplaces.

17.     Dark0de Marketplace, White House Marketplace, World Marketplace, and other marketplaces used for the illicit sale/purchase of controlled substances perform moderator and maintenance services, such as receiving complaints, providing technical assistance, and allowing customers to post reviews of their vendors.  The marketplace also provides a means by which its users can communicate with its administrators and operators.  These marketplaces also charge a commission from every transaction as a percentage of the sale price.

18.     However, unlike legitimate online marketplaces, Dark0de Marketplace, White House Marketplace, World Marketplace, Versus Marketplace, as well as other marketplaces encountered in this investigation and referenced herein, are dedicated and designed to facilitate the sale of illegalities, such as illegal narcotics and drug paraphernalia. Illegal drugs, such as methamphetamines, heroin, and cocaine, are openly advertised and sold and are immediately and prominently visible on the websites.  The websites are specifically designed to facilitate illegal commerce by working to ensure the anonymity of its administrators, as well as of the buyers and sellers who participate in commerce on the website. The websites are designed to achieve this anonymity primarily by operating as a hidden service on the Tor network.  To further promote

anonymity, purchases are made primarily in Bitcoin (or other virtual currency) using the websites' escrow services.

### Use of Pretty Good Privacy (PGP) keys to encrypt messages

19.     To encrypt messages and add anonymity, a marketplace user can use Pretty Good Privacy (PGP), an encryption system used for both sending and receiving encrypted messages and sensitive files. Using this encryption system, users can generate a public and a private key, which are mathematically related and used for encrypting and decrypting messages. Each key is a digital signature, a small file with a stream of uniquely generated characters. Each person using PGP has both a public key and a private key. The public key is disclosed/distributed to be used in encrypting a message/file for the corresponding private key holder, while the private key is kept secret to only be used by the message recipient to decrypt the message/file. A PGP encrypted message/file is scrambled in a complex way to make it unreadable to anyone other than the intended recipient, who holds the corresponding private key.

### SYNTROPY INVESTIGATION

20.     Beginning in the summer of 2021, agents began making online undercover purchases from the Syntropy moniker across multiple dark web marketplaces including World Market, White House Market, and Dark0de Market.  These purchases resulted in the delivery of narcotics to undercover post office boxes. The purchases from Syntropy were conducted on July 16, 2021 (1.7 grams cocaine received on July 23, 2021), August 3, 2021 (4.5 grams cocaine received on August 11, 2021), January 18, 2022 (8.6 grams methamphetamine received on January 20, 2022), February 1, 2022 (48.6 grams methamphetamine recovered on February 4, 2022), and February 9, 2022 (65.6 grams methamphetamine recovered on February 9, 2022). Each of the narcotics purchased from Syntropy field tested positive for the type of controlled substance

purchased. Each of the narcotics purchases also appeared to be the type of controlled substance purchased based on the training and experience of the agents conducting the investigation.

21.     On or about January 20, 2022, agents identified KEVIN FUSCO as a mailer of parcels containing narcotics purchased from Syntropy on the dark web. Between January 20, 2022, and March 10, 2022, agents tracked FUSCO's movements and seized approximately two hundred parcels deposited into the mail stream by FUSCO. The parcels were all opened pursuant to federal search warrants. Agents recovered various amounts of narcotics including suspected fentanyl, heroin, methamphetamine, and ketamine. The contents of the parcels appeared to be these types of unlawful narcotics based on the training and experience of the agents. Additionally, samples taken from various parcels field tested positive for fentanyl, heroin, methamphetamine, and ketamine. The parcel contents have been sent to the DEA Southeast Laboratory for further chemical testing.

22.     On March 9, 2022, agents obtained an arrest warrant for FUSCO and multiple search warrants. On March 10, 2022, agents arrested FUSCO near his residence and recovered a large quantity of various types of suspected narcotics at his workplace within 5725 Corporate Way #206 West Palm Beach, Florida.[4]  The narcotics were packaged in small quantities and organized in bins and cabinets near various USPS shipping materials. Approximately fourteen hundred (1400) of the small quantity baggies were located. From the same room, agents also recovered scales, drug paraphernalia and a painter's mask. The following photographs were taken at the execution of the search warrant at 5725 Corporate Way #206 West Palm Beach, Florida:

---

[4] The narcotics were prepackaged in mylar bags and separated out in various bins with other mylar bags of similar apparent weights. The packaging in the office was consistent with the packages received by law enforcement from online undercover purchases from Syntropy. And the packaging was consistent with the packaging found in the parcels sent by FUSCO.

  

  



23.     Each of these cabinets contained a series of trays with plastic bags and prepackaged mylar bags that were consistent with what agents had received from undercover darkweb purchases and otherwise intercepted during this case. Agents seized all the mylar bags from each tray and submitted the items to evidence. Due to safety concerns regarding the presence of fentanyl, agents did not open and field test the mylar bags during the search. Ultimately, several dozen items were submitted to the DEA Southeast Laboratory for testing.  Below find five evidence items for which test results have been received from the DEA Southeast Laboratory:

a)       785.8 g ± 0.2 g of 3,4-Methylenedioxyamphetamine (MDA) (See photograph below)



b)       194.7 g ± 0.6 g of 3,4-Methylenedioxyamphetamine (MDA)



c)       498 g ± 2 g of Heroin



d)       201 g ± 2 g  of N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl]propanamide (Fentanyl)



11

e)      563.6 g ± 0.2 g of Methamphetamine Hydrochloride with a purtity of 100% ± 6%



**Fusco Debrief**

24.      On March 15, 2022, FUSCO gave a statement to investigators in the presence of his attorney.[5] FUSCO indicated that he had met an individual named ANTON PECK during his time at a halfway house in 2019. Both FUSCO and PECK served time in federal prison after being convicted for offenses related to selling narcotics on the dark web.[6] The two developed a friendship and agreed to go into business together. Along with other individuals, PECK and FUSCO ran a virtual mail company called "Mailbox" which later became the company "mail2hut." FUSCO eventually moved from Miami to West Palm Beach and became responsible for Mailbox WPB which was located in the office at 5725 Corporate Way #206, West Palm Beach, Florida. During their friendship, PECK remarked to FUSCO that he would not have been caught and incarcerated for selling narcotics on the dark web if he had used a virtual mailbox company.

---

[5] FUSCO signed a *Kastigar* letter and gave a statement to law enforcement with the belief that it will benefit his case and potentially reduce his sentence. In addition to the charges contained in the criminal complaint, FUSCO also has a pending violation of federal supervised release based on this arrest.
[6] On October 27, 2017, FUSCO was adjudicated guilty for Money Laundering Conspiracy and Conspiracy to Distribute MDMA in the Southern District of Florida (17-CR-20275-UNGARO). According to the plea agreement/factual basis, he used Bitcoin to facilitate the online sale of MDMA. On December 20, 2017, PECK was adjudicated guilty for Monday Laundering Conspiracy in the District of Colorado (16-cr-00171-WJM). According to the plea agreement PECK used bitcoin to facilitate the online sale of MDMA.

25.     In approximately Summer of 2021, PECK was incarcerated in the Southern District of Florida for violating his supervised release. According to FUSCO, PECK's sister contacted FUSCO and asked him to go to the hotel where PECK had been living to recover his belongings. Among other things, FUSCO recovered a laptop and hard drive.  FUSCO delivered the items to PECK's sister who remarked that she had to bring the items to a third person (hereinafter TARGET PERSON #3). While PECK was incarcerated, FUSCO was at the office he shared with PECK in Miami, Florida, when TARGET #3 entered the office.  TARGET #3 emptied out a safe containing what FUSCO believed to be PECK's belongings and stated that he had to continue an unidentified activity on PECK's behalf because TARGET #3 felt he had no choice.

26.     Following PECK's release from his supervised release violation, FUSCO drove PECK to meet someone at a restaurant.  During the meeting, PECK and TARGET #3 discussed topics that FUSCO began to recognize related to the dark web.  FUSCO specifically recalled them mentioning a change in product description as well as the use of PGP technology.  FUSCO assisted PECK in moving items, including the two safes later found by agents, from an office in Boynton Beach, Florida, into 5725 Corporate Way #206 in either December 2021 or January 2022.   PECK later moved the metal cabinets into the same back room as the safes.

27.     FUSCO recalled that in December 2021 he began knowingly mailing narcotics for PECK.   PECK agreed to pay FUSCO $2500 a week to mail drug parcels. PECK shared a spreadsheet with FUSCO via iCloud which contained the relevant mailing information. PECK brought bulk narcotics to the 5725 Corporate Way #206 office where the narcotics were individually packaged by both FUSCO and PECK. PECK transported the narcotics in various containers. PECK often used a black pelican case. FUSCO communicated with PECK using the encrypted messaging application Wickr and the temporary message platform Privnote.  Both

methods ensured the destruction of sent messages after a given duration of time. However, FUSCO would occasionally copy/paste messages into the notes program of his devices so he could retain the messages.  FUSCO knew PECK's phone number was saved in his phone and he identified it for agents.

28.     FUSCO knew PECK had another office located in Boca Raton, Florida, on a road that also had the word "Corporate" in it.  FUSCO stated that PECK did not drive, and he did not have a regular home address.  PECK used Uber and often lived in hotels.  PECK often used cocaine and methamphetamine and made remarks to FUSCO about owing a great deal of money to his narcotics supplier. FUSCO further stated that approximately one week prior to March 10, 2022, PECK began moving some items out of the 5725 Corporate Way #206 office.

29.     During the execution of various search warrants on March 10, 2022, agents recovered FUSCO's laptop and phone.  Following the debriefing of FUSCO on March 15, 2022, agents were able to gain access to the contents of the electronic devices. Agents confirmed that the phone number for Anton PECK was saved in FUSCO's phone as "ap" and "mail2hut ap." Additionally, FUSCO had various text documents saved through the Notes application of his phone which appeared to contain references to narcotics trafficking.  Agents located a Note text document created on October 28, 2022, that contained login information for the Syntropy moniker used on several dark web markets.

30.     On FUSCO's laptop, a shared spreadsheet document was found appearing to contain shipping details for dark web narcotics customers including customer monikers, addresses, and narcotic types/weights. The spreadsheet document was shared by an account with the displayed name of "Alex Ivanov."  In the past, PECK had been arrested by Homeland Security Investigations while picking up a parcel addressed to "Alexei Ivanov" containing 1,020 MDMA

14

pills from a virtual mailbox shop in Scottsdale, Arizona.  In my training and experience, your affiant is aware that dark web actors often use false names and identities when registering internet accounts.

**PECK Investigation**

31.    Using a federally authorized vehicle tracker, on February 10, 2022, FUSCO's vehicle was observed going to the Seminole Hard Rock Casino and Hotel located in Hollywood, Florida.  A review of security camera footage from the establishment showed that FUSCO and an individual later identified as PECK met in the hotel gambling area before heading upstairs to a room for a short duration of time.  The following is an image taken from security cameras at the Seminole Hard Rock Casino and Hotel located in Hollywood, Florida on February 10, 2022.  FUSCO is on the left and PECK is on the right.



32.    Agents have determined that PECK was at the 5725 Corporate Way #206 location multiple times in the thirty days prior to March 10, 2022.  These instances include:

A) February 20, 2022 - 6:29:23 p.m. (departure):



B) February 24, 2022 - 3:52 p.m. (arrival) until February 25, 2022 - 9:35 a.m.

(departure)[7]:

   

---

[7] The arrival time is included as this is the only overnight stay identified thus far by investigators. During the execution of the search warrant, agents located a mattress in one of the rooms in the office.



C) March 1, 2022 - 9:55:23 p.m. (departure with Pelican briefcase):



33.     A review of USPS databases determined that PECK maintained a USPS business account with USPS. In establishing this account PECK provided an address of 2200 NW Corporate Boulevard, Suite 407, Boca Raton, Florida, and a phone number matching the number identified by FUSCO as belonging to PECK. The other identifiers provided on the account included a name of "mr anton peck," a username of "VMailbox2200," and an email of "florida.mailbox2200@gmail.com."

34.     A review of the DAVID Florida DMV database reflected that PECK does not currently have any vehicles listed and has not previously registered any vehicles since obtaining his Florida driver's license in 2019. The following is an image of PECK's driver's license photograph:



35.     After the arrest of FUSCO, a review of dark web narcotics markets determined that the Syntropy moniker was still active on the dark web.  FUSCO has been in custody since the date of his arrest. In my training and experience, your affiant is aware that it is the general practice of market administrators to remove vendor pages that have become inactive in filling orders placed by customers.  This led me to conclude that orders placed with Syntropy were still being filled by someone other than FUSCO.

36.     After the arrest of FUSCO, an FBI Online Covert Employee (OCE) saw that Syntropy was continuing to distribute narcotics on a dark web marked place. A purchase for 28 grams of crystal methamphetamine was made on March 30, 2022, and the parcel was received on or about April 7, 2022, at the UC ADDRESS. The return address on the parcel was Three D Print LLC, 1761 N. Young Circle (STE 3-293), Hollywood, FL, 33020. Agents opened the subject parcel and found it contained approximately 29.6 grams of a white crystal substance. The substance field tested positive for crystal methamphetamine.

37.     A search warrant authorizing GPS tracking of PECK's cell phone was signed and served on April 1, 2022 (Case No. 22-mj-8126-WM). Based on the review of cell phone tracking data obtained during the next several weeks, agents were able to learn that PECK would frequently travel to the location of 2200 NW Corporate Boulevard, Boca Raton, FL, 33431. Agents also observed that PECK would stay overnight in the location of 2200 NW Corporate Boulevard, Boca

Raton, FL, 33431, and on other nights he would stay in various hotels.

38.     On April 6, 2022, agents conducted surveillance of PECK aided by GPS information obtained from PECK's cellphone. At approximately 1:02 p.m., TFO Henry Ramos witnessed PECK exit the lobby of 2200 NW Corporate Boulevard, Boca Raton, FL, 33431, wearing a dark colored backpack and carrying a large cardboard box. PECK was also carrying a dark colored laptop bag slung over his left shoulder. TFO Ramos then witnessed PECK get into the backseat of the red Hyundai before the vehicle departed the area. Agents later determined that the red Hyundai was part of a ride sharing service.  Agents surveilled the red Hyundai as it drove PECK to the Waterstone Resort Hotel located in Boca Raton, Florida. PECK entered the resort. At approximately 2:34 p.m., SA Reyes observed PECK leaving the lobby of the Waterstone Resort and walk south through the parking lot and out to E. Camino Real. SA Reyes noted that PECK was carrying a dark in color laptop bag. SA Hammonds observed a black GMC Yukon arrive and then observed PECK get into the rear passenger compartment. Moments later the black GMC departed the area westbound on E Camino Real.

39.     At approximately 2:44 p.m., SA Reyes observed PECK exit the black GMC in the vicinity of 133 E Boca Raton Rd, Boca Raton, Florida. At approximately 2:47 p.m., TFO Ramos witnessed PECK arrive at the US Post Office located at 170 NE 2nd Street, Boca Raton, Florida. TFO Ramos then witnessed PECK reach into his laptop bag, retrieve three USPS flat rate envelopes, and deposit them into the blue USPS mail drop bin near the front entrance to the post office. See photograph below.



After PECK left the area, TFO Ramos was able to collect a total of three (3) USPS priority flat rate envelopes with a return address of "Vix Consult Ser. LLC, 1199 S. Federal Hwy #283, Boca Raton, FL, 33432." The parcels appeared to be consistent with the previous Syntropy mailings based on the method of packaging and the use of prepaid labels with generic names and alias return addresses.



40.    On April 11, 2022, agents opened the subject parcels pursuant to a federal search warrant (22-mj-8139-RMM). Within the first parcel, agents recovered approximately 16.4 grams of a white powdery substance which gave a positive field test result for fentanyl. The white powdery substance was contained in four small clear and blue clear zip lock baggies which were in four silver mylar bags. All the contents were further secreted inside of a paper mail envelop stuffed into the exterior envelope. Photographs of the parcel and its contents are below:



41.     Within the second parcel, agents recovered approximately 1.4 grams of an off-white/tan powdery substance which field tested positive for heroin. This off-white/tan powder was contained in a small clear zip-lock bag which was in one silver mylar bag. All the contents were further secreted inside of a paper mail envelop stuffed into the exterior envelope. Photographs of this parcel and its contents are below:



42.     Within the third parcel, agents recovered multiple blue pills weighing a total of approximately 3.4 grams. Based on my training and experience, the pills are consistent in appearance with oxycodone and counterfeit oxycodone (commonly referred to as "M30s"). Agents tested these pills multiple times and received positive TruNarc field test results for acetaminophen and N-ethylbuphredone (a Schedule 1 controlled substance).[8]   Agents also

---

[8]     A review of literature available at https://pubchem.ncbi.nlm.nih.gov/compound/N-Ethylbuphedrone#section=Patents indicates that N-ethylbuphredone is a stimulant.

employed a chemical reagent test and received a positive result for fentanyl.[9]  Through my training

and experience, your affiant is aware that counterfeit M30 pills are often cut with acetaminophen

and may include various narcotics in addition to fentanyl.  These blue pills were contained in two

small clear zip-lock bags which were in two silver mylar bags.  All the contents were further

secreted inside of a paper mail envelop stuffed into the exterior envelope.  Photographs of the

parcel and its contents are below.



43.     During the execution of the search warrant at FUSCO's business on March 10,

2022, agents observed many mylar bags of various sizes and colors.  Some of the bags recovered

during the search appear similar in size and shape to the silver mylar bags recovered in the three

above-described parcels mailed by PECK.  See the photographs from the search below:



44.     On or about March 30, 2022, an FBI OCE searched marketplaces for vendors using

the name "Syntropy" and made a purchase from the moniker "syntropy2021" on the Versus

---

[9] Through your affiant's training and experience, I am aware that due to the imprecise makeup of counterfeit M30 pills, agents often obtain various positive field test results

Marketplace for 28 grams of crystal methamphetamine for a cost of approximately $515.00 in cryptocurrency. The OCE provided the UC mailing address. On or about April 7, 2022, agents received the parcel and located 29.6 grams of a crystalline substance that tested positive for methamphetamine. The methamphetamine was found in four silver mylar bags and clear blue baggies like those mailed by PECK on April 6, 2022. Furthermore, paper envelopes were similarly put in the mailing envelope with the mylar baggies. The mailing of this parcel was not observed by law enforcement. Below are photographs of the parcel:

 



45.     The contents were packaged like other packages mailed by Syntropy during this investigation. The OCE noted that Syntropy and syntropy2021 shared similar marketplace listings, product descriptions, and pictures. An FBI OCE accessed the Dread Forum located on the Dark Web and found that, on approximately March 24, 2022, Syntropy had posted a message indicting that he was active on the Versus Marketplace in addition to other marketplaces. The only moniker using the word "syntropy" on the Versus Marketplace was syntropy2021.

46.     On April 10, 2022, an FBI OCE accessed the Versus Marketplace and placed an order with syntropy2021 for 56 grams of crystal methamphetamine for approximately $989.53 in Bitcoin funds. On April 13, 2022, agents conducted surveillance of PECK aided by GPS information obtained from PECK's phone. At approximately 11:00 a.m., SA Reyes and TFO Carvajal established surveillance outside of PECK's business located at 2200 NW Corporate Boulevard, Boca Raton, Florida. PECK's cell phone GPS location data placed the phone in the vicinity of the business location. At approximately 12:24 p.m., SA Reyes observed and digitally photographed PECK walking along a footpath in a southerly direction. SA Reyes noted that PECK was wearing a gray t-shirt and khaki pants and was carrying a dark in color laptop bag over his left shoulder. Agents surveilled PECK until he eventually crossed to the north side of NW 24th Street towards a blue USPS mail drop bin at the parking lot entrance of an office building located at 2201 NW Corporate Boulevard. At approximately 12:33 p.m., TFO Carvajal observed and digitally photographed PECK opening the mail drop box and placing something inside.  The following are photographs of what agents observed:



47.     TFO Carvajal then observed PECK walk eastbound towards his business location. TFO Carvajal observed PECK enter the lobby of 2200 NW Corporate Boulevard, Boca Raton, Florida. Moments later, agents retrieved a USPS flat rate envelope from the blue USPS mail drop

bin. Agents noted that the parcel retrieved was addressed to the UC address the OCE provided syntropy2021 when placing the order for 56 grams of crystal meth on April 10, 2022. The parcel was later opened, and two clear zip lock baggies were retrieved that contained a white crystalline substance resembling crystal methamphetamine based on agents' training and experience. The white crystalline substance weighed 73 grams. It was tested utilizing a NARC II field drug test kit which yielded a positive result for methamphetamine.

## CONCLUSION

Based on the facts outlined above, your affiant believes there is probable cause to charge Anton PECK with conspiracy to distribute 50 grams of more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 841(b)(1)(A)(viii); conspiracy to distribute 40 grams of more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 841(b)(1)(A)(vi); and possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), and 841(b)(1)(A)(viii).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
ARTURO CALDERON
Special Agent, FBI

Sworn to me via Telephone-FaceTime by the
affiant in accordance with the requirements of
Fed. R. Crim. P 4.1 on this 6 day of May 2022.

_____
HON. RYON M. MCCABE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-mj-8179-RMM**

<u>**PENALTY SHEET**</u>

**Defendant's Name: ANTON PECK**

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|---|---|---|---|
| 1 | Conspiracy to possess with intent to distribute 50 grams or more of methamphetamine | 21 U.S.C. §§ 841(a)(1), 846 and 841(b)(1)(A)(viii) | Up to life imprisonment; Minimum of 10 years' imprisonment; Up to $10,000,000 fine; Supervised release of at least 5 years and up to life; $100 Special Assessment |
| 2 | Conspiracy to possess with intent to distribute 40 grams or more of fentanyl | 21 U.S.C. §§ 841(a)(1), 846 and 841(b)(1)(B)(vi) | Up to 40 year imprisonment; Minimum of 5 years' imprisonment; Up to $5,000,000 fine; Supervised release of at least 4 years and up to life; $100 Special Assessment |
| 3 | Possession with intent to distribute 50 grams or more of methamphetamine | 21 U.S.C. §§ 841(a)(1), and 841(b)(1)(A)(viii) | Up to life imprisonment; Minimum of 10 years' imprisonment; Up to $10,000,000 fine; Supervised release of at least 5 years and up to life; $100 Special Assessment |